**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

KAREEM BONNER,                                              CASE NO.: 1:12-cv-32

        Plaintiff,                                              Judge Michael R. Barrett

    v.

SCOPE SERVICES, INC. *et al.*,

        Defendants.

**OPINION AND ORDER**

This matter is before the Court on the Motion for Summary Judgment of Defendants Scope Services Incorporated ("Scope") and Utility Outsource Services, Inc. ("Utility Outsource"). (Doc. 39). Plaintiff Kareem Bonner ("Bonner") has filed a response in opposition (Doc. 50), and Defendants have filed a reply (Doc. 51).

**I.  FACTUAL BACKGROUND**

The facts to which the parties cite in their respective briefs, as construed in the light most favorable to Plaintiff, are as follows:

Scope Services is a contract company. (Doc. 38-2, PageId 328). Utility Outsource is a payroll company that provides payroll services for employees in the United States who work under contracts executed by Scope Services with other third parties. (Id.).

In or about October 2008, Bonner was hired as an employee of Utility Outsource. (Doc. 38-1, PageId 308; Doc. 38-2, PageId 328-29). Bonner was hired initially to work as a field service representative under a Scope Services contract in which he performed reconnects and disconnects of electric and gas meters on residential and commercial properties for Duke Energy in the Cincinnati/Northern Kentucky area. (Doc. 38-1, PageId 301; Doc. 38-2, PageId 328-29,

1

333). London Davis was the area manager and was responsible for overseeing the execution of the Duke Energy project in the Cincinnati/Northern Kentucky area. (Doc. 38-2, PageId 328-29).[1]

On or about March 3, 2009, Bonner suffered physical injuries to his ribs and back during a car accident that occurred while working. (Doc. 38-1, PageId 316). Defendants received notice that Bonner had filed a workers' compensation claim for his injuries on April 17, 2009. (Doc. 39-3, PageId 402).

In or about July or August of 2009, Bonner received a promotion from field service representative to supervisor. (Doc. 38-1, PageId 309). As a field supervisor, Bonner performed some of the same work as the field service representatives, but also was tasked with oversight of the field service representatives and conducting audits for the client. (Doc. 38-1, PageId 310).

On or about June 21, 2010, Davis informed Bonner he was promoted from supervisor to lead supervisor. (Doc. 38-1, PageId 310; Doc. 39-3, PageId 402). As lead supervisor, Bonner spent some portion of his time in the field but was also tasked with overseeing the other supervisors for the project. (Doc. 38-1, PageId 310-11). The physical requirements for the job of project supervisor included (a) the ability to work in confined spaces, heights, and around moving mechanical parts, (b) normal abilities to perform stopping, crawling, reaching, and twisting/standing, (c) ability to walk, sit or stand for extended periods of time, (d) ability to operate a motor vehicle safely for extended periods of time, and (e) normal functioning senses, good eyesight, color vision, and field and depth perception. (Doc. 39-6).

On or about November 29, 2010, Bonner received a promotion to acting project manager along with a raise in pay. (Doc. 38-1, PageId 311; Doc. 39-3, PageId 402; Doc. 39-4, PageId 403). Davis promoted Bonner to that position and also was Bonner's supervisor. (Doc. 38-1,

---

[1] Davis testified that he is a minority. (Doc. 38-2, PageId 336).

2

PageId 311; Doc. 38-2, PageId 332). As "acting" project manager, Bonner was being evaluated as to his ability to handle the position. (Doc. 38-2, PageId 333). Generally, the project manager acts as the liaison with the client and effectively communicates with the client. (Id.). The project manager also is tasked with ensuring adherence to project processes and with supervising and managing other employees in regards to safety and attendance. (Id.). At the time of the promotion, Davis completed an employee payroll information form that he electronically signed. (Id., PageId 345).

Towards the end of 2010 or beginning of 2011, Davis hired Mike Philbeck as a senior project manager for Scope Services. (Doc. 38-2, PageId 334). As the senior project manager, Philbeck was Davis' direct assistant with multiple contracts. (Id.).[2] Philbeck was Bonner's immediate supervisor while he served as acting project manager. (Doc. 38-1, PageId 317-18). For a time, Philbeck supervised Bonner remotely from an out-of-state office location. (Id., PageId 318). Over the phone and through email communications, Philbeck expressed that he was impressed with Bonner's performance. (Doc. 38-1, PageId 318).

In or about January 2011, Davis received a phone call from the client contract manager at Duke Energy indicating that they had concerns about the project communication and how the project was being managed at the time. (Doc. 38-2, PageId 335). Davis spoke with Bonner by phone and informed him of the concern, and also visited the project himself. (Doc. 38-2, PageId 335). Davis also asked Philbeck to go to Cincinnati to evaluate the project, Bonner's performance, and the concerns raised by Duke Energy. (Doc. 38-2, PageId 335). In or about February 2011, Philbeck met with Bonner in person. (Doc. 38-1, PageId 318). Philbeck introduced himself to Bonner as "a good old southern boy and a die-hard proud redneck." (Doc.

---

[2] While the parties direct the Court to no evidence concerning the race of Philbeck, it is presumed for the purposes of this Opinion and Order that Philbeck is Caucasian.

3

38-1, PageId 319). During one meeting, the black employees were on one side of the room and the white employees were on the other side and Philbeck told Bonner to "tell these guys slavery is over." (Id.).

Another incident involved comments concerning the color of a rental car. (Id.). Philbeck commented to Bonner that he had been given a black rental car but hated black rental cars, and that he only likes the white rental cars. (Id.). When his rental car later broke down, Philbeck told Bonner that he does not "like black stuff because it never works[.]" (Id.). Bonner testified that the comments had racial undertones. (Id.).

Later, Bonner drove Philbeck to his hotel, at which point Philbeck threw a bag of trash he had in his hand into Bonner's truck and say "there you go boy, you know what to do with that . . ." (Id.). Bonner inferred that he was implying he was a janitor or his servant. (Id.).

At another point, Philbeck told Bonner that he would never let him be the project manager and that he would not "let some hip-hopper and be-bopper run this ship[.]" (Doc. 38-1, PageId 320).

Philbeck also probed Bonner for information on another black employee who was a supervisor. (Doc. 38-1, PageId 320). According to Bonner, Philbeck was seeking information that would justify the black employee's demotion. (Id.). Ultimately, that employee was demoted. (Id.). In comparison, Bonner testified that a white supervisor had engaged in a dangerous act for which he should have been terminated and for which Davis wanted to terminate him but Philbeck would not terminate him even though Bonner brought the issue to Philbeck's attention on several occasions. (Id.).

On March 29, 2011, Philbeck completed an employee performance evaluation for Bonner. (Doc. 39-4). Philbeck rated Bonner below average in communication skills, initiative,

4

project management, self-control, safety, business skills, and creativity. (Id, PageId 403). He rated Bonner substandard in attendance and promptness, organization and time-awareness, attention to detail, and client interaction. (Id.). In the written comments, Philbeck indicated that Bonner needed to improve on time management and noted he was unavailable to answer the phone and was missing in action a lot. (Id., PageId 404). He further noted that Bonner's organization needed to improve, that his project management skills are "shaky," and that his customer relations "are weak in that Duke management is not satisfied with follow-up requests or respons[e] time to requests or incidents." (Id.). On April 11, 2011, after Davis received that evaluation, Bonner was demoted from acting project manager to supervisor, and his pay was reduced accordingly. (Doc. 38-2, PageId 335; Doc. 39-3, PageId 402). The Employee Payroll Information Form for the demotion was signed by Mike Philbeck on April 6, 2011. (Doc. 51-1, PageId 456). Bonner testified that he was not aware that he had been demoted until right before his eventual termination. (Doc. 38-1, PageId 324).

On or about April 7, 2011, Bonner visited a physician. (Doc. 39-5, PageId 404). In the Status Report, it is noted that Bonner had an "[e]xacerbation of pain" relating to his March 2009 injury and that he would be incapacitated from April 7, 2011 through April 22, 2011. (Id.). At a follow up appointment on April 21, 2011, the incapacitation period was extended through May 5, 2011. (Id., PageId 406). On May 5, 2011, the Status Report provided for "[r]egular work as of 05/23/11[.]" (Id., PageId 407). Then, on May 31, 2011, the Status Report indicated that Bonner could work as of June 22, 2011 subject to the following medical restrictions: (a) no heavy lifting (10 lbs. maximum); (b) no hazardous or fast moving machinery; (c) no excessive driving; (d) sitting only 8 hours a day with scheduled breaks; (e) ground level work only; no climbing ladders; (e) minimum bending or stooping; (f) no over shoulder work; and (g) no twisting or

turning. (Id., PageId 408). The restrictions were continued, with several additional limitations, through July 12, 2011. (Id., PageId 409-11). Bonner was released to regular work on July 12, 2011 where he could "assume full supervisor position." (Id., PageId 410-11). On September 7, 2011, Bonner was authorized to work as of September 21, 2011 with relatively the same medical restrictions. (Id., PageId 412). There was no end date provided for those medical restrictions. (Id.).

Upon receipt of Bonner's work restrictions, Davis had a discussion with Richard Sommers (President of Scope) and Phyllis Jones about Bonner's ability to perform the task as project supervisor and to try to find a reasonable accommodation. (Doc. 38-2, PageId 338). Defendants allowed Bonner to ride in a vehicle with another supervisor, but Bonner alleged that it bothered him and it was painful to ride in a vehicle with someone else. (Id.). Davis testified that Bonner ultimately was terminated by letter dated September 14, 2011 because his physical limitations prevented him from performing the physical requirements of his job as a supervisor (or to ride along with another supervisor in a vehicle) and no other reasonable accommodations or positions were available. (Doc. 38-2, PageId 339-40; Doc. 39-7, PageId 418). His physical limitations, however, would not have prevented him from performing the duties of a project manager. (Id.).

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" only if its resolution affects the outcome of the suit. *Id.*

On summary judgment, a court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party has the burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).

Once the moving party has met its burden of production, the nonmoving party cannot rest on his pleadings, but must present significant probative evidence in support of his complaint to defeat the motion for summary judgment. *Anderson*, 477 U.S. at 249. "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* at 252. Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

### III. ANALYSIS

Defendants move for summary judgment on each of the claims asserted in Bonner's Amended Complaint, which are divided into the following categories:  (1) racial discrimination in violation of Title VII of the Civil Rights Act of 1964 and Ohio Rev Code § 4122.02; (2) disability discrimination in violations of the Americans with Disabilities Act ("ADA"); and (3) retaliation in violation of the ADA, Title VII of the Civil Rights Act of 1964, and Ohio Rev. Code § 4123.90.  As Bonner raised no arguments as to the dismissal of the disability discrimination claim or the retaliation claims, those claims are hereby dismissed. The remainder of this Opinion and Order will focus on the only issue addressed by Bonner in his brief:  race discrimination.

### A.  Race Discrimination

Bonner alleged that Defendant unlawfully discriminated against him based on his race pursuant to Title VII and Ohio Revised Code § 4112. The Ohio Supreme Court has held that federal caselaw interpreting Title VII is equally applicable to discrimination claims brought under Ohio law. *Staunch v. Cont'l Airlines, Inc.,* 511 F.3d 625, 631 (6thCir. 2008) (citing *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm.*, 66 Ohio St. 2d 192 (Ohio 1981)). Therefore, the following summary judgment analysis applies to both the Title VII and Ohio discrimination claims.

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discrimination against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

In a case alleging employment discrimination, a plaintiff can withstand a motion for summary judgment either by presenting direct evidence of discrimination or circumstantial evidence from which a jury may infer a discriminatory motive. *Rallins v. Ohio State Univ.*, 191 F. Supp. 2d 920, 928 (S.D. Ohio 2002) (citing *Kline v. Tennessee Valley Authority*, 128 F.3d 337, 348-49 (6th Cir. 1997)).

### 1. Direct Evidence

Direct evidence is evidence "which, "if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999). "Consistent with this definition, direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." *Johnson v. Kroger Co.*, 319 F.3d 858, 865

8

(6th Cir. 2003). When direct evidence is presented, the plaintiff does not bear the burden of disproving other possible non-discriminatory reasons for the adverse action, and the burden instead shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive. *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 382 (6th Cir. 2002).

Although Bonner argues that direct evidence of discrimination exists, the Court disagrees. The comments of Philbeck upon which Bonner relies are not direct evidence of discrimination. Not only do those comments require inferences to be made from the totality of the circumstances to determine that they are evidence of racial animus, but further inferences also must be made by the Court to find that the challenged actions of demotion and/or termination were motivated by any such racial animus, particularly considering that there is evidence that Davis was the actual decision-maker but Philbeck signed the payroll form that effectuated Bonner's demotion. Given that an inference is required from the circumstantial evidence to find racial animus or that unlawful discrimination was at least a motivating factor, the statements are not direct evidence of discrimination.

## 2. Circumstantial Evidence

When no direct evidence of discrimination exists, a claim of employment discrimination is to be analyzed using the burden-shifting approach first announced in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973) and later modified by *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981). To establish a *prima facie* case of discrimination under Title VII, a plaintiff must show that "(1) he or she was a member of a protected class; (2) he or she suffered an adverse employment action; (3) he or she was qualified for the position; and (4) he or she was replaced by someone outside the protected class or was

treated differently than similarly-situated, non-protected employees." *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004).

If the plaintiff succeeds in establishing a *prima facie* case, an inference of discrimination arises, and the burden then shifts to the defendants to articulate some legitimate nondiscriminatory reason for its actions. *Burdine*, 450 U.S. at 254-56. If the defendant articulates a nondiscriminatory reason for its actions, then the plaintiff must have an opportunity to prove by a preponderance of the evidence that the legitimate reasons put forth by the defendant were not its true reasons but were a mere pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 802.

Defendants contend that Bonner has failed to prove (1) the fourth element of his *prima facie* case and (2) Defendants' proffered legitimate non-discriminatory reason for the adverse action was pretextual.

### a. Fourth Element of *Prima Facie* Case

To support an inference of unlawful discrimination, Bonner must show he was replaced by someone outside the protected class or was treated differently than similarly-situated, non-protected employees. *DiCarlo*, 358 F.3d at 415. Comparable non-minority employees who received more favorable treatment than the plaintiff must be similarly situated in all relevant respects. *Ayers-Jennings v. Fred's Inc.*, 461 F. App'x 472, 476 (6th Cir. 2012) (citing *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352-53 (6th Cir. 1998). Although the plaintiff does not need to demonstrate an exact correlation, "'the individuals with whom the plaintiff seeks to compare [his] treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of

them for it.'"  *Ayers-Jennings*, 461 F. App'x at 477 (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)).

While Bonner's opposition does not directly address the fourth element, the Court finds there to be sufficient evidence that Bonner was replaced with a non-minority individual to warrant continuation of the analysis with respect to the adverse action of demotion.  Specifically, Davis testified that Bonner was replaced with Caucasian males after he was demoted from "acting" project manager to supervisor.  (Doc. 38-2, PageId 336).

However, there is no evidence that a similarly situated, non-minority employee was treated more favorably than Bonner with respect to his demotion or termination.  (*See* Doc. 50, PageId 445-47).  Even broadly construing Bonner's argument to encompass the factual background section of his opposition brief, the Court still finds that Bonner has not met his burden in this regard.  Bonner points to his deposition testimony concerning a Caucasian supervisor, Mr. McCourt.  (Doc. 38-1, PageId 320).  Specifically, Bonner points to his testimony that McCourt had "done something that was, by Scope standards and Duke standards, a dangerous act that he should have been terminated for."  (*Id.*).  He testified that Philbeck was aware of it but he did not "think [Philbeck] wrote [McCourt] up for that."  (*Id.*)  He further testified that Davis wanted to fire McCourt but Bonner suggested to Davis that he should only be written up rather than terminated.  (*Id.*)  That testimony is insufficient to satisfy the fourth element.

Bonner offers no explanation as to how he was similar to McCourt in all relevant respects.  While the testimony suggests that they had the same supervisors (Philbeck and Davis), that is where evidence as to the similarities between them end.  There is no evidence that McCourt was an "acting" project manager like Bonner such that they were subject to the same

11

standards and evaluation.  In fact, there is no evidence, except Bonner's vague and speculative testimony, as to McCourt's precise employment status or disciplinary record such that there could even be a meaningful comparison.  Nor is there evidence presented that the standards for demoting an "acting" project manager would be the same as the standards for employment actions taken in response to a safety incident.  Finally, the conduct of Bonner and McCourt is plainly not the same without differentiating or mitigating circumstances. Bonner was subject to an evaluation of his ability to perform in the role as "acting" project manager after a customer complaint whereas McCourt was involved in a safety incident after which Bonner encouraged Davis not to terminate McCourt.  Accordingly, Bonner and McCourt cannot be deemed appropriate comparators.

Further, Bonner complains that McCourt was not terminated for this more serious incident.  Nonetheless, Bonner testified that Davis <u>wanted</u> to terminate McCourt for the incident but Bonner encouraged him not to terminate him.  Moreover, Bonner himself was not terminated either as a result of the customer complaint or Philbeck's evaluation; he was demoted.  Other than speculative testimony, there is no evidence as to McCourt's employment status nor is there any evidence that Bonner and McCourt were subject to the same standards for these vastly different employment situations.

With respect to Bonner's eventual termination, it concerned his work restrictions and Defendants' alleged inability to accommodate those work restrictions.  The decision not to terminate McCourt, however, was in relation to an unspecified safety incident.  Bonner and McCourt therefore did not engage in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.

Further, the Court has been pointed to no evidence concerning who, if anyone, replaced Bonner upon his termination.

### b. Pretext

As Bonner has satisfied his *prima facie* case as to his demotion, Defendants must articulate a legitimate, non-discriminatory reason for their actions. Defendants indicated that Bonner's demotion was the result of his status as an "acting" project manager, a Duke Energy representative's complaint that Davis received about Bonner's management of the project, and Philbeck's observations about Plaintiff's management of the project [3] Bonner does not dispute that these are legitimate non-discriminatory reasons for the adverse actions. As such, Bonner must now show that Defendants' articulated reasons were a pretext for discrimination.

To prove pretext, Bonner must produce sufficient evidence from which the jury could "reasonably reject [Defendants'] explanation" and infer that Defendants "intentionally discriminated" against him. *Braithwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir. 2001). To do so, Bonner must allege more than a dispute over the facts upon which his demotion was based. *Id.* at 494. There are three interrelated ways to show pretext. First, he can show that the proffered reason had no basis in fact. To do so, he must produce evidence to show that the reasons given by the employer simply did not happen. *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). Second, he can show that the proffered reason was insufficient to motivate the adverse action. *Id.* Ordinarily, to establish the insufficiency of the proffered reasons, the plaintiff must show that "other employees, particularly employees not in

---

[3] As for Bonner's termination, Defendants have asserted that Bonner's indefinite physical limitations precluded him from performing in his role as supervisor and there were no reasonable accommodations that would allow him to perform in that role. The Court need not consider the arguments of pretext as to the adverse action of termination, however, because Bonner has failed to satisfy his *prima facie* case as to that adverse action. To the extent Bonner argues that but for his demotion he would not have been terminated for lack of an accommodation for his work restrictions because he still could perform the job requirements for the project manager position, that issue is one of causation and damages that is better addressed at trial.

the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated" it actions towards the plaintiff. *Id.* Third, he can adduce evidence that shows the proffered reason did not actually motivate the adverse action. *Id.* When a plaintiff attempts to prove pretext in this manner, the plaintiff

> admits the factual basis underlying the employer's proffered explanation and further admits that such conduct *could* motivate dismissal. The plaintiff's attack on the credibility of the proffered explanation is, instead, an indirect one. In such cases, the plaintiff attempts to indict the credibility of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was *more* likely than that offered by the defendant. In other words, the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it "more likely than not" that the employer's explanation is a pretext, or coverup.

*Id.* In evaluating pretext, courts should not apply the three tests in a formalistic manner. *Chen v. Dow Chemical Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009). "Pretext is a commonsense inquiry[.]" *Id.* The court must "ask whether the plaintiff has produced evidence that casts doubt on the employer's explanation and, if so, how strong [that evidence] is." *Id.*

Upon review, the Court finds sufficient evidence to create a genuine issue of material fact on the issue of pretext. Bonner has produced evidence as to multiple comments made by Philbeck with racial undertones from which a reasonably jury could infer racial animus. Bonner also has cited to testimony that Philbeck informed him that he would not "let some hip-hopper and be-bopper run this ship[.]" (Doc. 38-1, PageId 320). There also is testimony concerning at least one other incident in which Philbeck sought out an individual of a minority race to demote, and that individual ultimately was demoted. Although there is testimony that Davis made the ultimate decision to demote Bonner and that Philbeck did not recommend demotion to Davis, Philbeck signed the form authorizing the demotion as the supervisor such that this remains a genuine issues of material fact that remain to be decided by the trier of fact.

Even if Philbeck was not the ultimate decision-maker, an employer may be liable under the cat's paw theory for an intermediate employee's discriminatory motive when the employer takes into account facts provided by the biased supervisor in determining whether to take a particular adverse action when that biased supervisor's action was intended to cause the adverse employment action. *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011); *Chattman v. Toho Tenax Am.*, 686 F.3d 339, 351 (6th Cir. 2012). That is true even if the decision-maker's exercise of judgment also is a proximate cause of the adverse action. *Staub*, 562 U.S. at 422. Not only is the evidence, as explained above, sufficient to raise a reasonable inference that Philbeck acted with racial animus and with intent to cause Bonner's demotion, but the evidence construed in favor of Bonner also indicates Davis relied to some degree upon Philbeck's negative evaluation of Bonner's performance when deciding to demote Bonner. Accordingly, dismissal for lack of pretext is not appropriate at this stage.

While there are multiple facts that may weaken the pretext argument considerably, including the facts that Davis was a minority, that a Duke representative complained about Bonner's performance, and that the alleged behavior of Bonner set forth in the evaluation undisputedly occurred, there are sufficient facts construed in the light most favorable to Bonner that would allow a reasonable jury to find in favor of Bonner on the issue of pretext. Accordingly, the race discrimination claims under federal and Ohio law based on Plaintiff's demotion survive dismissal at this stage.

### IV. CONCLUSION

Consistent with the foregoing, Defendants' motion for summary judgment (Doc. 39) is **GRANTED IN PART** and **DENIED IN PART.** The disability discrimination claims, the retaliation claims, and the race discrimination claims based solely on Plaintiff's termination are

15

**DISMISSED** with prejudice. The case shall proceed on the claim for race discrimination in violation of federal and Ohio law as it relates to Plaintiff's demotion.

    **IT IS SO ORDERED.**

                                                      s/Michael R. Barrett
                                                      Michael R. Barrett, Judge
                                                      United States District Court